Catherine SULLIVAN, Plaintiff,

v.

NEWBURGH ENLARGED SCHOOL DISTRICT CLARENCE COOPER and Ronald Thomas Defendants.

No. 00 CIV. 3431(CM).

United States District Court, S.D. New York.

Sept. 8, 2003.

Catherine E. Sullivan, Plattekill, NY, Pro se.

Gilbert J. West, Sr., Residence, Newburgh, NY, for Plaintiff.

Mark C. Rushfield, Esq., Shaw & Perelson, LLP, Mark C. Rushfield, Shaw & Perelson, L.L.P., Highland, NY, for Defendants.

MEMORANDUM ORDER AND DECISION GRANTING IN PART AND DENYING IN PART DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

MCMAHON, District Judge.

Plaintiff Catherine Sullivan sues the Newburgh Enlarged School District ("the

District"), Clarence Cooper, and Ronald Thomas for sex-based discrimination and a sexually hostile work environment under Title VII of the Civil Rights Act (42 U.S.C. § 2000e), 42 U.S.C. § 1983, and the New York Human Rights Law (N.Y. Exec. L. § 296 *et seq.*)("NYHRL"). Plaintiff also brings claims for race-based discrimination and a racially hostile work environment under the same provisions, as well as under 42 U.S.C. § 1981. Additionally, plaintiff alleges that Cooper and the District are liable for Thomas's sexual harassment of plaintiff because of their "willfully negligent hiring and retention of" Thomas. Finally, plaintiff alleges that Thomas and Cooper are liable to plaintiff, presumably under the NYHRL, for "aiding and abetting" each other and the District in committing the alleged discrimination.

The District moves for summary judgment against plaintiff. In the alternative, the District makes a motion in limine to exclude evidence from trial related to Thomas's criminal record.

For the following reasons, I:(1) dismiss plaintiff's claims against the individual defendants for failure to prosecute; (2) deny summary judgment as to plaintiff's Title VII claims of a gender or race-based hostile work environment; (3) deny summary judgment as to plaintiff's New York Human Rights Law claims; (4) grant summary judgment to defendant on plaintiff's claims under 42 U.S.C. §§ 1983 and 1981; and (5) grant summary judgment to defendant on plaintiff's New York State common law negligence claim.

## BACKGROUND

In accordance with Local Rule 56.1(a), the District has annexed to its summary judgment motion a separate statement of material facts as to which it contends there is no genuine issue to be tried. Plaintiff has failed to respond with a corresponding statement of the material facts as to which she contends there exists a genuine issue, as required by Local Rule 56.1(b). Under Local Rule 56.1(c), all material facts set forth in the statement by the moving party are deemed admitted unless controverted by the statement of the opposing party. I thus deem all of the material facts in the defendant's Rule 56.1 statement admitted. *Gubitosi v. Kapica,* 154 F.3d 30, 31 n. 1 (2d Cir.1998).

Not only does plaintiff fail to provide the required Rule 56.1 Statement, she also fails to cite to the record in her Memorandum in Opposition to Defendant's Motion for Summary Judgment. ("Plaintiff's Mem."). Moreover, the plaintiff fails to cite any federal case law in her memorandum; the entire memorandum is supported by only five New York state cases and a citation to the CPLR, all of which relate to the legal standard for granting summary judgment. Plaintiff's counsel, a member of the bar of this court, has failed to comply with the most basic requirements of motion practice in the Southern District of New York.

Nevertheless, I note that Defendant's 56.1 Statement is primarily a summary of plaintiff's lengthy deposition, which covers over one thousand four hundred pages of transcript—the vast majority of which was provided to the court by the defendant as support for the Defendant's 56.1 statement. So the parties are, for the most part, in agreement as to the facts. What they vigorously dispute is not the events themselves, but the motivations of the individuals involved and, of course, the appropriate legal consequences.

## I. Factual Background

### A. The Roles and Responsibilities of the Parties at the STAR Academy

On October 5, 1998, plaintiff Catherine Sullivan, a Caucasian woman, began working as a special education teacher in the

District's "STAR Academy," an alternative high school program for students with chronic and disruptive behavioral and discipline problems who had been suspended from other high schools. (Defendant's 56.1 Statement ("Def.56.1"), 29, 30.)[1] Plaintiff worked at the STAR Academy for just over ten weeks.

Clarence Cooper, who is an African–American man, was the building administrator for the STAR Academy, and was responsible for managing the program. *Id.* at 6.

When plaintiff began working at the STAR Academy, Cooper introduced her to Ronald Thomas, who is also an African–American man. *Id.* at 30. Cooper explained to plaintiff that Thomas was a social worker and director of the social side of the program. *Id.* Cooper told plaintiff that she should take "social work items and things of a psychological nature" to Thomas. *Id.*

Plaintiff knew of Thomas before she began working at the STAR Academy, because her friend, Alfreda Robinson, had worked with Thomas at another program in the school district called "Project Forward." At some point before plaintiff began working at the STAR Academy, plaintiff learned from Robinson that Thomas had been told by the Associate Superintendent of Secondary Instruction & Public Services, Dr. William J. Swart, that he (Thomas) was not a principal or supervisor at Project Forward and that he was not to act as if he were one. *Id.* at 17. Robinson advised plaintiff not to work at the STAR Academy, because she thought Thomas was dangerous, a "weasel," and "no good." *Id.* at 22.

Of a staff of approximately ten individuals on the permanent staff of the STAR Academy while the plaintiff was employed there, three were Caucasian. *Id.* at 26.

All three were women: Ms. Nora Casey–Goldstein, Ms. Barbara Rubin, and plaintiff. *Id.*

Plaintiff is a special education teacher, but there was only one special education student at the STAR Academy, so plaintiff did not have a regular schedule of classes. *Id.* at 34. Plaintiff was explicitly told by other members of the STAR academy staff that they did not believe that special education students should be placed in the program. *Id.* She perceived that the staff's feelings regarding special education were also extended towards her "as the personal harbinger of disabled and mentally ill people." (Plaintiff's Deposition ("Pltf.Dep."), 264:20–23.)

When she started at STAR Academy, plaintiff's only assignment at the school was writing student assessment reports for Cooper. *Id.* at 174:4–25, 175:1–14. Plaintiff was "extremely uncomfortable" with not having a regular schedule. *Id.* at 211:15–16. In the first week of the program, she asked Cooper several times for a schedule, and he responded by stating that "he [would] define [her] roles and responsibilities [at STAR Academy]." *Id.* at 211:19–23. In November, plaintiff spoke to Thomas about her desire for a schedule, and Thomas told her that he would "fix it." *Id.* at 233:3–10. When plaintiff told Cooper that she had spoken to Thomas, Cooper reminded her that he would define her work and responsibilities, and assigned her a new report to write. *Id.* at 235:2–9. Nevertheless, plaintiff perceived that Thomas had "fixed" the problem for her, because shortly thereafter Cooper assigned her "SAC duties," which required her to monitor students who had been suspended from academic classes. *Id.* at 235:12–25. Plaintiff, together with an African–American male teacher named Todd Fulton, was assigned SAC duties for

---

1. STAR is an acronym for "Success Through Achievement and Respect." (Def.56.1, 18.)

a total of five days, beginning in early December, 1998. (Def.56.1, 69.)

Plaintiff believes that she was assigned the SAC duties because Thomas reported to Cooper that other teachers were not reporting to the SAC classroom when assigned. (Pltf.Dep., 235:12–25.) Later, however, Thomas told plaintiff that he disagreed with Cooper's assigning her to SAC duty, and complained about Cooper's "waste of manpower." (Def.56.1, 86.) Thomas then told plaintiff that she could do crafts projects with the students, and asked her to provide him with a lesson plan for teaching crafts. *Id.* at 86, 90. However, when plaintiff began teaching her first craft lesson, other teachers went to Cooper to report that the students she was teaching were supposed to be in their academic classes. *Id.* at 92. Cooper came to plaintiff's classroom, sent the students to their classes, and got into an argument with Thomas. *Id.* at 93. Cooper instructed plaintiff not to do crafts with the students until he consulted with some other teachers. *Id.*

In addition to the SAC duties and the one aborted attempt at a crafts lesson, plaintiff also occasionally "covered" classrooms for other teachers.

## II.  Incidents at the STAR Academy

The relationship between Thomas and plaintiff was initially cordial, but became extremely acrimonious during the ten weeks that plaintiff worked at the STAR Academy. The tension between plaintiff and defendant grew over a series of incidents between October or early November of 1998, culminating in plaintiff's departure from the STAR Academy on December 16, 1998.

**2.**  Both Thomas and the other African–American male teacher told plaintiff, following an incident in which the student claimed that plaintiff slapped her, "I have your back."

## A.  Thomas's Use of "Black Dialect"

Thomas used the word "Nigger" liberally at the STAR Academy in talking about African–American persons in a pejorative way, both while talking to African–Americans and while talking to others, including plaintiff. (Def.56.1, 42.)

Plaintiff, who has studied African–American culture and worked in the African–American community for a number of years, believes that she has a substantial understanding of African–American language use and gestures. *Id.* at 35. Plaintiff told Thomas that she found it offensive when he used black dialect in her presence, such as when he referred to students as "little brothers," or used the "N-word" while talking about "his own people." (Pltf. Dep. at 624:3–9, 643:16–24.) Plaintiff told Thomas that use of "black dialect" was "disrespectful" to her and that it implied an intimacy that they did not share. *Id.* at 647:1–3.

At one point, plaintiff told Thomas: "I would like to help you help yourself. Here are a list of about 20 Irish words from Boston that you would be dead out of luck with." (Pltf.Dep., 647:9–12.) Plaintiff claims that she did so in order to illustrate to him why he should not use dialect with her. *Id.* at 647: 17–19.

While plaintiff concluded that Thomas's use of dialect with her constituted gender and race discrimination and created a hostile work environment for her, she did not believe that it was discriminatory or hostile when another black male teacher used dialect in speaking with her, even when he used the same phrase used by Thomas.[2] *Id.* at 470:1–18.

Plaintiff interpreted this as gender and race discrimination from Thomas, but not from the other teacher. (Def.56.1, 64.)

## B.  Name Calling By Students

Plaintiff complained to Thomas that when students left his room and walked by Ms. Casey's room they would call her a "jew bitch" and a "dirty garlic jew," and when they walked by Ms. Rubin's room they would call her a "dirty jew chipmunk." (Pltf. Dep., 422: 21–24.) Plaintiff also complained to Thomas that students used to call her "yellow heifer" but that now they called her "bitch." Plaintiff told Thomas that, based on the fact that students were using these slurs immediately after they left his classroom, she believed that he was influencing their actions. *Id.* at 423: 6–16.

Plaintiff claims that in response to her accusations Thomas said: "I don't deny it." *Id.* at 423:20–21. This conversation was interwoven with a "heated" but "professional" discussion regarding Khalid Mohammed, and plaintiff's belief that Thomas should not be influencing "malleable young people" with political opinions and "rebel-rousing rhetoric." *Id.* at 422:2–14; 425:17–20

Following this conversation with Thomas, plaintiff told Cooper that she would like to speak to him "with regard to inappropriate behavior on behalf of the students, which I feel, when they have the big group session, is being promoted, if that's the word." *Id.* at 433:18–21. Plaintiff then told Cooper about the students' comments to Ms. Casey–Goldstein and Ms. Ruben, and told him that students had stopped calling her "yellow heifer" and started calling her "old white woman." *Id.* at 433:22–434:9. According to plaintiff's sworn testimony, Cooper told her that he did not believe her, and he walked away. *Id.* at 434:11–434:8. Cooper does not mention this incident in the portion of his workers' compensation hearing testimony in the record.

## C.  The Wilding Incident and the Discussion with Thomas that Followed

On November 9, 1998, plaintiff was watching a classroom of students when a fight broke out among several students. (Def.56.1, 43.) This incident is referred to by the parties as the "wilding incident." Plaintiff was assaulted by a student during this incident, and some students claimed that plaintiff herself slapped another student. *Id.*

Following the "wilding incident," Thomas, Fulton, and plaintiff were in Thomas's office, and plaintiff expressed concern about covering a classroom that included students involved in the incident. *Id.* at 65. Thomas wheeled his chair over to plaintiff, who was seated with her knees and arms crossed in front of her, placed his hands below plaintiff's knees and flung them apart, put his hands under her arms and moved them apart; and said: "you get where I'm coming from; you know what I mean?" *Id.* Plaintiff responded "I get where you're coming from, Ron." Plaintiff did not report this behavior to Cooper. *Id.* at 66.

## D.  The Box Cutter Incident and Aftermath

Later that month, plaintiff was watching another classroom of students when one of the students displayed a box cutter and refused to turn it over to plaintiff. *Id.* at 44. At the same time, in another area of the school, an altercation was occurring between a parent and another teacher, an altercation which plaintiff believed that Thomas covered up. (Pltf.Dep., 541:3–7.) Plaintiff called Cooper at his home that night to report the incident, but could not remember the name of the student who had the box cutter. *Id.* at 536:14–23. Plaintiff told Cooper that she would figure out his name the next day. *Id.* at 537:6–9.

Later that night, plaintiff came to the conclusion that Thomas had "ultimate power" over the students, parents, and others at the school. *Id.* at 541:12–17. Plaintiff began having dreams where Thomas had a "Medusa head." *Id.* at 542:4. In later dreams, Thomas appeared to plaintiff as a "Fagin character," as in a Charles Dicken's novel (Oliver Twist). *Id.* at 543:3–7. In these dreams, Thomas was directing the students to stab the plaintiff with knives. (Def.56.1, 51.)

The next day, at school, plaintiff asked Cooper if he would go through the school with her, classroom by classroom, so that she could identify the student who had the box cutter; plaintiff alleges that Cooper refused to do so, and that he did not "write up" the incident. *Id.* at 545:7–16. Plaintiff also complained to Cooper that Thomas was out of control, dangerous, and that she was dreaming that he was a snake. *Id.* at 546: 5–23. Plaintiff made similar complaints to Cooper in the first or second week of December, reporting that things were so bad between her and Thomas that she was having dreams every night in which Thomas appeared as a "Medusahead" snake. *Id.* at 531:7–24.

### E. The Cafeteria Incident and Plaintiff's Complaints to Cooper

At some point around December 1, 1998, Thomas complained to plaintiff about the unkempt way he believed certain African–American female teachers left the cafeteria, and he used derogatory racial terms in reference to the women. (Def.56.1, 67.) He also told plaintiff that the women were prevented from "testifying and signifying" with the plaintiff at their table, and told plaintiff that she should "sit with the white ladies where you belong." *Id.;* Pltf. Dep. at 500:3.

Shortly thereafter, plaintiff spoke with Cooper about Thomas's comments regarding the cafeteria seating and told him that

"Mr. Thomas is being a little bit outrageous." *Id.* at 68. She also told Cooper that Thomas had said that the three white female staff members were fearful of students at the STAR Academy. *Id.* While she was speaking with Cooper, Thomas entered his office and asked if she was telling him that the white female staff members were afraid of the students, which prompted plaintiff to cry. *Id.* Thomas then stated, to Cooper, "See her, she's afraid; that's why she's crying" and then told Cooper that the black female staff members were treating plaintiff terribly. *Id.* at 18.

Plaintiff contends that she cried because she was "ripping mad." (Pltf.Dep., 503:11–12.)

### F. The "Sniffing" Incident in the SAC Room

Plaintiff further alleges that in early December, while she was working in the SAC classroom with Todd Fulton, an African–American male staff member, Thomas would enter the room and "prance" around while "making sniffing sounds," including sniffing around Fulton and plaintiff. (Def.56.1, 75.) Plaintiff asked Fulton what Thomas was sniffing for, and Fulton told her that Thomas was sniffing for sex. *Id.* Once, while sniffing around the room, Thomas dipped his head towards plaintiff's lap and "sniffed" her genital area. *Id.* at 76. Plaintiff told Thomas "I get it and cut it out" and Thomas laughed. *Id.* Plaintiff did not report this behavior to Cooper. *Id.* at 77.

### G. Threats by Thomas

Between December 1 and December 9, 1998, on two occasions, Thomas told plaintiff "you better not fool around with me, Sullivan, because I go across the street to fuck the bitches up." *Id.* at 82. Thomas also made other comments which plaintiff

perceived to be threats, including a statement to plaintiff that: "I am not going to fuck with you because you know made men"—a comment that plaintiff understood to imply that she had "Mafia" connections. (Pltf. Dep. 635:15–17; 636:2–6.)

Plaintiff did not tell Cooper about the specifics of these threats, but instead told him generally, as discussed above, that Thomas was dangerous and outrageous. *Id.* at 639:19—642:24.

## H. The Fear Discussion with the Students

On December 9, 1998, plaintiff went to Thomas's classroom to present the crafts lesson that he had asked her to prepare. *Id.* at 91. Thomas was in the room with Todd Fulton and approximately nine students. (Pltf.Dep.757:9–21.) Thomas told her: "Get out, I am in session." *Id.* at 758:13–14. Plaintiff took this to mean Thomas was conducting a group counseling session, and she left the classroom and returned to her office. *Id.* at 758:22–24, 759:16–20. From her office, plaintiff could hear "commotion," in the form of loud voices, coming from Thomas's classroom. *Id.* at 760:6–15. Plaintiff returned to Thomas's classroom to begin her crafts lesson and asked for a "heads up" up what the commotion was about before she "assume[d] responsibility for [the] large group." *Id.* at 763:9–15. Thomas began slamming papers against the radiator and "prancing" and "sashaying" around the room in what plaintiff describes as an "African American preaching style." *Id.* at 763:22–767:9. Thomas said: "And she says what?" and "I have got places to be, people to see" and left the room. *Id.* at 768:13–17, 770 11–13. The students in the classroom began making "wooing noises;" stating "He is right, he is right;" and laughing. *Id.* at 770:23–24, 771:6, 772:9–12. When plaintiff asked what was going on a student told her: "Mr. Thomas said

that you white ladies were afraid of us." *Id.* at 17–19.

Thomas returned to the room and a discussion ensued concerning the box cutter incident and whether the white female teachers at the school were afraid of the students. (Def.56.1, 91.) Thomas then left the room, telling the students to pay attention to the plaintiff and telling the plaintiff to "get on with it." *Id.;* Pltf. Dep., 780:8–9. As plaintiff began her lesson, teachers began entering the room and asking why their students were there. (Pltf.Dep., 781:12–782:6.) The lesson was ended by Cooper, who sent the students back to their classrooms. *Id.* at 782:14–22.

Thomas, after arguing loudly in the hallway with Cooper, returned to the classroom, where plaintiff was seated on the floor, and yelled at her, circling around her and stating, "You passive aggressive bitch. You don't stick up for yourself." (Def.56.1, 92.) Thomas also told her: "This is all your fault." (Pltf.Dep., 788:2.) Plaintiff continued to sit on the floor and began to cry and then, after Thomas left the room, got up and "went berserk" on Todd Fulton. *Id.* at 788:10–21.

Later that day, or the following day, plaintiff met with Cooper. *Id.* at 93; Pltf. Dep., 799:14–17. They discussed Cooper's scheduling disputes with Thomas, and Cooper apologized to plaintiff, telling her that she should not take the incident personally and that he knew she had done a lot to prepare for the students' Christmas party, but that she should not do anything else until he has a consensus from other teachers. (Def. 56.1, 93: Pltf. Dep., 802:6–16.) Plaintiff told Cooper that "being stepped on by someone's feet makes it personal for me." (Def. 56.1, 93; Pltf. Dep., 802:18–22.) Cooper told her that he hadn't seen that. *Id.* There was no further discussion between plaintiff and Cooper of plaintiff's behavior on December 9. (Def.56.1, 93.)

## I. Plaintiff's Final Day at the STAR Academy

Plaintiff had some pleasant interactions with Thomas between December 9 and December 16, 1998, but her feelings about Thomas were becoming increasingly angry and fearful. (Def.56.1, 97, 100.) Plaintiff became convinced that Thomas was attempting to control everything about her, including what she ate, and that his behavior towards her was the type of behavior that abusive husbands exhibit towards their abused wives. (Def.56.1, 100.)

On the morning of December 16, 1998, plaintiff had placed a note in Thomas's mailbox in the main office of the school, refusing an offer of a ride to buy Christmas decorations. (Def.56.1, 98–99.) Later that day, Thomas read plaintiff's note out loud to the staff members in the office, including plaintiff and Cooper, in what plaintiff characterizes as a "theatrical presentation" in which he was "cracking" with her.[3] *Id.* at 100. Plaintiff responded, in a voice she characterized as a "teacher-preacher voice" that, "It cannot have been me that wrote you a letter like that, because I speak English." *Id.* Plaintiff believed that she had won the "cracking game" by her response, because a number of the African–American staff members in the room began laughing, and one made "woo woo" noises. *Id.* Thomas then embraced plaintiff, in what some staff members, including Cooper, perceived to be an apologetic hug. *Id.* at 101. Plaintiff, however, found it to be a threatening hold, in which he held her hands "like a Heimlich hands." (Pltf.Dep., 1050.) Plaintiff told defendant that she would "fight him" and

told him not to go near the third story stairwell, apparently suggesting that she would push him down the stairs. *Id.* at 1052:14–1054:20.

Later that day, Thomas came to plaintiff's office and stated that he thought he had done something to offend her. *Id.* at 103. Thomas also referred to plaintiff as spreading cheese or bait so that he, the "rat," would respond. *Id.* Plaintiff claims that during this visit Thomas flapped his arms like a chicken, kicked his legs high, and made noises. *Id.*[4] Plaintiff yelled at Thomas to sit down, but Thomas left plaintiff's office. *Id.* Plaintiff then chased after Thomas screaming: "What did I do?," and "I'm not taking this anymore!," and stating that Thomas was a snake. *Id.* at 104. She then complained to Cooper, stating that Thomas was a snake and proclaiming that he was untrustworthy. *Id.* at 105. Cooper told plaintiff not to quit, and to go home and rest. *Id.* Plaintiff went home, but never returned to work. *Id.* at 106.

## J. Investigation by the Sexual Harassment Complaint Officer

Cooper interviewed Thomas about the incident and reported it to the Associate Superintendent for Human Resources. *Id.* at 114. The Associate Superintendent, pursuant to District policies, referred the matter for investigation to the Associate Superintendent of Education Support Services/Sexual Harassment Complaint Officer/EEOC Compliance coordinator, Ms. Joan Goady–Crosson, on December 18, 1998. *Id.* at 114. Goady–Crosson interviewed Cooper and Thomas but, despite

---

**3.** Plaintiff describes "cracking" as a dialectical form of speaking with "cadence and rhythm," accompanied by gestures and pauses to capture the audience's attention and encourage laughter. (Pltf.Dep., 1020–1039.)

**4.** Defendant has submitted an audiotape made by plaintiff of a portion of her conversa-

tion with Thomas—which she inadvertently recorded while making a Christmas music tape. The tape, which is truncated and difficult to understand, does not capture the sound of "flapping" or any other distinct "noises." It does reflect the conversation in which Thomas referred to himself as a "rat."

several attempts, was unable to question plaintiff. *Id.* at 116. She concluded that there was no evidence of sexual harassment or racial discrimination. *Id.* at 117.

### K. Complaints to Cooper regarding Thomas by Other Teachers

Cooper participated in a hearing regarding these matters in connection with plaintiff's workman's compensation claim. In the portion of the hearing transcript provided by defendant, Cooper testified that of the nine or ten people on staff at the STAR Academy, he remembers three individuals (in addition to Ms. Sullivan) complaining to him about Thomas. (Deposition of Clarence Cooper, Tab 5 in Defendant's Binder # 1, p. 32.) They were a female health aide/nurse, an English teacher named Dorothy, and a "computer person." *Id.* The portion of the transcript provided does not provide the gender of the computer person, the race of any of the three individuals, or the substance of the complaints.

### L. Termination of Thomas

On August 30, 1999, Thomas was terminated by the District, after it discovered that he had falsified his September 16, 1996 application for employment by indicating that he had never been convicted of a crime. *Id.* at 20. In fact, Thomas had been convicted of armed robbery, for which he was imprisoned from 1976 to 1984. *Id.*

### III. Procedural Background

Plaintiff filed a formal charge of race and sex-based discrimination against the District with the Equal Employment Opportunity Commission ("EEOC") on or about August 18, 1999, and the EEOC issued a "right to sue letter" on or about December 16, 1999. *Id.* at 1,3. On May 5, 2000, plaintiff brought this action against the District, the Superintendent, and the Board of Education members. I granted a motion to dismiss the Superintendent and the Board of Education members on June 26, 2001, on the grounds that they could not be held individually liable under Title VII. On August 3, 2001, plaintiff filed an amended complaint, adding allegations against Thomas, and Cooper and adding the state law claims. To this day, she has not served Thomas or Cooper with process.

### IV. Plaintiff's Allegations of Gender and Race Discrimination

In her Amended Complaint, plaintiff alleges that Thomas engaged in sexual harassment when, in incidents described above, Thomas: (1) "sniffed" her; (2) physically uncrossed her arms and legs; and (3) "embraced" her in the main office on December 16, 1998. Plaintiff refers to these incidents as "examples," and claims that these acts, "and others" (unspecified) created a sexually hostile work environment for her.

Plaintiff further alleges in her Amended Complaint that Thomas created a racially hostile work environment for her at the school by: (1) "making "anti-white" statements to Plaintiff including but not limited to causing students to address Plaintiff as "white lady" rather than by Plaintiff's name;"(2) "refusing Plaintiff's urging that curriculum and language be taught multiculturally and insisting over Plaintiff's objection that students emphasize black 'dialect' in communication because in Thomas' view this form was superior to 'white' forms in language in communication;" (3) "constantly mocking Plaintiff with gestures and dialect in a manner intending to disparage Plaintiff as a Caucasian;" and (4) "imparting to Plaintiff that Plaintiff should not, as a white person, be teaching in a mostly African–American school body."

With one exception, all of plaintiff's allegations of a sexually and racially hostile

work environment appear to be based in large part on the events described above. Plaintiff's Amended Complaint contains the only reference to her contention that Thomas refused to teach "multi-culturally" or insisted that students emphasize black "dialect." There is no evidence to support this allegation anywhere in the record, including plaintiff's own lengthy deposition.

In addition to the factual allegations enumerated in her amended complaint, plaintiff's deposition testimony describes additional actions by Thomas, and some actions by Cooper, which plaintiff claims were discriminatory and/or which created a hostile work environment based on her gender and race. Many of these allegations are wholly conclusory: Plaintiff describes incidents at the STAR Academy that upset her, and then asserts, in conclusory fashion, that the incidents constituted discrimination against her on the basis of race and/or gender (in most cases, both), and/or contributed to a hostile work environment based on gender and race. Some of what plaintiff asserts, frankly, makes no sense to me.[5]

## DISCUSSION

### I. Summary Judgment Standard

A party is entitled to summary judgment when there is no "genuine issue of material fact" and the undisputed facts warrant judgment for the moving party as a matter of law. Fed.R.Civ.P. 56(c); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). When considering a motion for summary judgment, "the court must view the evi-

dence in the light most favorable to the party against whom summary judgment is sought and must draw all reasonable inferences in [its] favor." *Matsushita Elec. Indus. Co. Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). Summary judgment is inappropriate if there is evidence in the record as to any material fact from which an inference could be drawn in favor of the non-movant. *Rattner v. Netburn*, 930 F.2d 204, 209 (2d Cir.1991). "Conclusory allegations, conjecture and speculation, however, are insufficient to create a genuine issue of fact." *Kerzer v. Kingly Manufacturing*, 156 F.3d 396, 400 (2d Cir.1998) (citation omitted).

■ The Second Circuit has instructed that district courts must be "especially cautious" in deciding whether to grant the "drastic remedy" of summary judgment in a discrimination case, "because the employer's intent is often at issue and careful scrutiny may reveal circumstantial evidence supporting an inference of discrimination." *Belfi v. Prendergast*, 191 F.3d 129, 135 (2d Cir.1999). Because the discriminatory acts are often "hidden under a veil of self-declared innocence," a discrimination victim is "seldom able to prove his or her claim by direct evidence and is usually constrained to rely upon the cumulative weight of circumstantial evidence." *Rosen v. Thornburgh*, 928 F.2d 528, 533 (2d Cir.1991). However, a plaintiff cannot survive summary judgment in a discrimination case without "com[ing] forward with at least some credible evidence that the

---

5. For instance, plaintiff claims that Thomas discriminated against her by calling her after she had stated that she did not want to talk to anyone on the phone while she was at work, and that this constituted gender and race-based harassment. (Pltf.'s Dep. 396:5–25.) When plaintiff did speak with Thomas, and he told her that he wanted her help in replacing Cooper, she concluded that this statement

also constituted gender and race discrimination against her. *Id.* at 398:19–21. Plaintiff reasoned that Thomas was acting in a racially discriminatory manner towards her simply by thinking that he could involve her in discussing Cooper, after he had previously implied to plaintiff that he thought Cooper was a "moronic black that didn't deserve the job." *Id.* at 398–406.

actions of the ... [defendants] were motivated by [...] animus or ill will." *Grillo v. New York City Transit Auth.*, 291 F.3d 231, 234 (2d Cir.2002).

■ In the context of a hostile work environment claim, the Second Circuit has recognized that determination of the existence of an impermissibly hostile environment is a "mixed question of law and fact." *Richardson v. New York State Dep't of Corr. Service*, 180 F.3d 426, 437 (2d Cir. 1999). As such, it is "especially well-suited for jury determination and summary judgment may be granted only when reasonable minds could not differ on the issue." *Id.* (*quoting Mendell v. Greenberg*, 927 F.2d 667, 673 (2d Cir.1990)).

## II. The Complaint is Dismissed As Against Thomas and Cooper for Failure to Prosecute

■ Under Fed. R. Civ. Procedure 4(m), plaintiff had 120 days from filing of the Amended Complaint on August 3, 2001 to serve the named defendants. At the time of filing the First Amended Complaint, plaintiff's counsel, Richard Wolf Esq., included a letter to the Clerk of the Court certifying that he had served a copy of the complaint "on Defendants' attorney, Mark Rushfield." Mr. Rushfield, however, made it clear in every document that he filed in this case, including the Answer to the original complaint, that he represented only the District. On August 27, 2001, Mr. Rushfield filed an Answer to the Amended Complaint, again doing so specifically on behalf of the District alone. Neither Thomas nor Cooper ever filed an answer to the Amended Complaint, and there is no evidence on the docket sheet of this Court that either of them was ever served with process.

On November 6, 2001, I granted Mr. Wolfe's request to withdraw as plaintiff's counsel, after plaintiff refused to communicate with him for several months. On December 18, 2001, Mr. Gilbert J. West, Esq. filed a notice of appearance for plaintiff. Neither of plaintiff's attorneys ever requested an extension of time to serve the individual defendants, nor did plaintiff do so during the brief period of time that she was proceeding *pro se*.

While Fed. R. Civ. P. 4(m) provides that the Court should extend the time for service for an appropriate period if the plaintiff shows good cause for the failure, Sullivan has failed to articulate *any* reason to justify not serving the two individuals with process in the eighteen months since the Amended Complaint was filed, during which period discovery was taken and motions filed. Plaintiff concedes awareness that Mr. Rushfield is not counsel to Thomas or Cooper, so she cannot claim that service of the complaint on Mr. Rushfield provided service on the individual defendants. Moreover, I note that plaintiff was explicitly made aware of the requirements of Fed.R.Civ.P. 4(m) on September 7, 2000, by the Honorable Denny Chin, who was originally assigned to this case and who informed plaintiff that her original complaint would be dismissed unless she promptly effected service.

This is not a situation in which the requirements of the rule should be "overlooked" due to plaintiff's *pro se* status. She has been represented by two attorneys who are members of the Bar of this Court. If among the three of them they failed to serve two named defendants, this court has no obligation to excuse their lack of diligence.

■ Plaintiff, aware of the requirements of Fed.R.Civ.P. 4(m), but offering the court no explanation for her nonperformance, has failed to meet her burden of showing "good cause." Under these circumstances, I can conceive of no justification for plaintiff's failure to serve her complaint, particularly as good cause cannot

result from mere inadvertence, neglect, or mistake of her attorney. *See e.g., AIG Managed Mkt. Neutral Fund v. Askin Capital Mgmt. L.P.*, 197 F.R.D. 104, 108 (S.D.N.Y.2000). I therefore dismiss this action pursuant to Fed.R.Civ.P. 4(m) as against Thomas and Cooper.[6]

As a result, plaintiff's fourth cause of action, which asserts a claim against Cooper and Thomas, presumably under the NYHRL, for "aiding and abetting" in discrimination, is dismissed without prejudice. Plaintiff's third cause of action is also dismissed as to Cooper without prejudice.

I now turn to plaintiff's remaining causes of action as against the District.

### III. Summary Judgment is Not Appropriate as to Plaintiff's Title VII Claim of a Hostile Work Environment

◼ Title VII, in relevant part, prohibits employers from discriminating in the hiring, discharge, or the setting of "compensation, terms, conditions, or privileges of employment" because of an individual's race, color, religion, sex, or national origin. 42 § U.S.C.2000e–2(a). Title VII thus protects plaintiff from discrimination on the basis of being white and being a woman. *McDonald v. Santa Fe Trail Transp. Co.*, 427 U.S. 273, 278–79, 96 S.Ct. 2574, 49 L.Ed.2d 493 (1976) (holding that Title VII prohibits discrimination based on any race, including Caucasian); *Brown v. Henderson*, 257 F.3d 246, 253 (2d Cir.2001) (Title VII protects women from discrimination because of sex). Moreover, sex-based discrimination need not be "sexual" in nature, rather, it need only be motivated by plaintiff's gender.

Prohibited discrimination under Title VII can take many different forms, some of which are explicit acts by an employer—such as firing an employee—and others that arise from discriminatory harassment significant enough to alter the terms and conditions of an individual's employment.

While plaintiff alleges explicit acts of gender and race-based discrimination by the district, the gravamen of both her complaint and her memorandum in opposition to summary judgment is that she was exposed to a hostile work environment during her ten weeks at the STAR Academy because of her race and her gender.

◼ To prevail on a hostile work environment claim under Title VII, plaintiff must establish (1) a hostile work environment, and (2) that a specific basis exists for imputing the conduct that created the hostile environment to the employer. *Van Zant v. KLM Royal Dutch Airlines*, 80 F.3d 708, 715 (2d Cir.1996) (citation omitted).

Defendant argues alternatively that (1) plaintiff fails to establish a hostile work environment based on either sex or race and (2) there is no basis for imputing liability to the District.

### A. There are Genuine Issues of Material Fact as to the Existence of Both a Race and Gender–Based Hostile Work Environment.

◼ To establish the existence of a hostile work environment, plaintiff must show that her "workplace was permeated with discriminatory intimidation, ridicule, and insult" that was "sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive work environment." *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21, 114 S.Ct. 367,

---

**6.** As all claims against Cooper and Thomas are dismissed, I need not reach defendant's argument that the allegations against Cooper cannot be a part of this action because plaintiff did not include claims against Cooper in her EEOC complaint—a claim that the District does not have standing to pursue.

126 L.Ed.2d 295 (1993) (quotation marks and citations omitted) (*quoted in Distasio v. Perkin Elmer Corp.*, 157 F.3d 55, 62 (2d Cir.1998)). Determining whether the alleged incidents create an environment that is "hostile" or "abusive" depends on a totality of the circumstances. *Id.* at 23, 114 S.Ct. 367. In *Harris*, the Supreme Court established a non-exclusive list of factors relevant to determining whether discrimination is severe and pervasive: "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Id.*

■ A plaintiff can avoid summary judgment by demonstrating "either that a single incident [of discrimination] was extraordinarily severe or that a series of incidents were sufficiently continuous and concerted to have altered the conditions of her working environment." *Cruz v. Coach Stores, Inc.*, 202 F.3d 560, 570 (2d Cir. 2000) (citations and internal quotation marks omitted). Plaintiff's evidence must also show, however, that the conduct at issue creates an environment that is both objectively and subjectively hostile. *Richardson v. New York State Dept. of Corr. Service*, 180 F.3d 426, 436 (2d Cir.1999). Thus, the plaintiff must subjectively perceive the environment to be hostile and the trier of fact must find that "a reasonable person who is the target of discrimination would find the working conditions so severe or pervasive as to alter the terms and conditions of employment for the worse." *Id.* However, the environment need not be "unendurable" or "intolerable." *Whidbee v. Garzarelli Food Specialties, Inc.*, 223 F.3d 62, 70 (2d Cir.2000); *Terry v. Ashcroft*, 336 F.3d 128, 148 (2d Cir.2003). "The fact that the law requires harassment to be severe and pervasive before it can be actionable does not mean that employers are free from liability in all but the most egregious cases." *Whidbee*, 223 F.3d at 70 (*quoting Torres v. Pisano*, 116 F.3d 625, 631 (2d Cir.1997)).

■ Even if plaintiff can establish that she was exposed to an objectively and subjectively hostile work environment, she will not have a claim under Title VII unless she can also demonstrate that the hostile work environment was caused by animus towards her as a result of her membership in a protected class. *Forts v. City of New York Dep't of Corr.*, No. 00 Civ. 1716, 2003 WL 21279439, at *4 (S.D.N.Y. June 4, 2003). "An environment that would be equally harsh for all workers, or that arises from personal animosity, is not actionable under the civil rights statutes." *Id.* citing *Brennan v. Metro. Opera Ass'n*, 192 F.3d 310, 318 (2d Cir. 1999).

■ In the instant case, the parties do not dispute that the incidents between Thomas and plaintiff took place or that the plaintiff found them subjectively hostile. But defendant argues that the incidents alleged do not support a finding of an objectively hostile work environment. However, as the Second Circuit recognized in *Richardson*, "that the facts are undisputed does not automatically mandate summary judgment; rather, summary judgment is appropriate only where application of the law to those undisputed facts will reasonably support only one ultimate conclusion." 80 F.3d at 438. Here, more than one conclusion is possible.

■ Plaintiff's allegations, taken as a whole, create a genuine issue of material fact as to whether Thomas, on the basis of plaintiff's race or gender, undertook a campaign of continuous and concerted harassment over the course of plaintiff's ten week employment at the STAR Academy which was so pervasive that it rendered her work environment objectively

hostile. I note that the Second Circuit has specifically found that evidence of racial harassment can be used by a plaintiff to bolster a claim of sex-based hostile working environment, and vice versa. *Cruz v. Coach Stores*, 202 F.3d 560, 572 (2d Cir. 2000). And the Circuit has also recognized that incidents which appear neutral on their face can be used to establish a course of discrimination, such as when the same individual is accused of multiple acts of harassment, some of which are overt and some of which appear neutral in isolation. *Alfano v. Costello*, 294 F.3d 365, 375 (2d Cir.2002). Plaintiff has offered evidence about multiple incidents of offensive and bizarre behavior directed toward her by Thomas during a ten week period. A trier of fact must determine whether (1) Thomas's behavior was motivated by plaintiff's race and/or sex, and (2) whether plaintiff's work environment was objectively hostile—that is, whether the nature and frequency of Thomas's conduct was sufficiently pervasive so as to objectively alter the conditions of plaintiff's employment for the worse.

**B. There is a Genuine Issue of Material Fact as to Whether the District is Liable for any Race or Gender–Based Hostile Work Environment.**

Of course, plaintiff cannot prevail on her Title VII claim unless she also establishes a basis for imputing the conduct that created the hostile environment to her employer. *Van Zant*, 80 F.3d at 715. The District contends that plaintiff has not raised a genuine issue of material fact that would permit a jury to impose liability for Thomas's acts on the District.

The District is vicariously liable to plaintiff for a Title VII violation if an actionable hostile work environment was created by a supervisor with immediate (or successively higher) authority over her.

*Burlington Indus. Inc. v. Ellerth*, 524 U.S. 742, 765, 118 S.Ct. 2257, 141 L.Ed.2d 633 (1998); *Faragher v. City of Boca Raton*, 524 U.S. 775, 807, 118 S.Ct. 2275, 141 L.Ed.2d 662 (1998). Plaintiff claims that Thomas was her supervisor at the STAR Academy, and that the District is thus vicariously liable for her behavior. The District denies that Thomas was plaintiff's supervisor. In the alternative, the district claims that, it is entitled to invoke the so-called "Ellerth" defense, an affirmative defense to vicarious liability established in the companion Supreme Court decisions *Ellerth* and *Faragher*. *Ellerth*, 524 U.S. at 765, 118 S.Ct. 2257; *Faragher* 524 U.S. at 777–78, 118 S.Ct. 2275; *see also Mack v. Otis Elevator Co.*, 326 F.3d 116, 125 (2d Cir.2003) (discussing *Ellerth* and *Faragher*).

The Second Circuit recently adopted a broad definition of "supervisor" for purposes of Title VII liability, holding in *Mack v. Otis Elevator Corp.* that "[a]n individual qualifies as an employee's 'supervisor' if: (a) the individual has authority to undertake or recommend tangible employment decisions affecting the employee; *or* (b) [t]he individual has authority to direct the employee's daily work activities." 326 F.3d at 127 (rejecting a more narrow definition of supervisor used by other courts and adopting the Equal Employment Opportunity Commission's definition).

However, even under a broad definition of supervisor, there is no evidence in the record to support plaintiff's assertion that Thomas was her supervisor at the STAR Academy. To the contrary, the undisputed evidence shows that it was Cooper, not Thomas, who supervised plaintiff. Plaintiff admits that she was told by Cooper that Thomas dealt only with the "social work" aspects of the school, and that, she as a teacher, reported to Cooper. Plaintiff also admits that she was explicitly told by

Cooper, after she spoke to Thomas about her lack of responsibilities, that he, not Thomas, would define her roles and responsibilities. And the undisputed facts show that Cooper quickly and decisively ended plaintiff's attempt to provide crafts lessons to the students, which was a task "assigned" to her by Thomas.

Plaintiff responds to defendant's argument in its motion for summary judgment that Thomas is not a supervisor by claiming, "Thomas was given the authority to hire and fire, as well as, [sic] supervise while acting as an administrator while working for The District at Project Forward." (Plaintiff's Opposition to Summary Judgment, p. 7.) But Thomas's position at Project Forward, another program in the District where Thomas was employed before the STAR Academy, is irrelevant. Moreover, by her own testimony, plaintiff knew before she even began working at the STAR Academy that plaintiff was explicitly told that he was *not* a supervisor at Project Forward and that he should not hold himself out to be.

Plaintiff argues in the alternative that even if Thomas was not a supervisor, he "masqueraded" as one. But if plaintiff erroneously thought that Thomas had some supervisory role in relation to her, her belief was not clearly reasonable, and cannot create liability for the district. *Ellerth*, 524 U.S. at 759, 118 S.Ct. 2257 (holding that in cases where "there is a false impression that the actor was a supervisor, when he in fact was not, the victim's mistaken conclusion must be a reasonable one.").

There is no evidence in the record from which a trier of fact could conclude that Thomas was plaintiff's supervisor, or that she reasonably believed that he was. There is thus no basis from which plaintiff can establish vicarious liability to the district.

In the absence of vicarious liability, an employer can also be liable for an employee's hostile work environment if the employee can establish that she was harassed by a fellow employee and that the District either provided her with no reasonable avenue of complaint or that it knew of the harassment but did nothing about it. *Richardson*, 180 F.3d at 441; *Quinn v. Green Tree Credit Corp.*, 159 F.3d 759, 766 (2d Cir.1998) *abrogated in part on other grounds by National R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 122 S.Ct. 2061, 153 L.Ed.2d 106 (2002). Plaintiff argues that even if Thomas is not her supervisor, the District is liable because Cooper knew of her harassment and did nothing to stop it and because the District provided her with no reasonable avenue of complaint.

The District has provided the Court with a copy of its non-discriminatory hiring policy and its sexual harassment policy and complaint procedures, as exhibits to the Affidavit of Joan Goady–Crosson, the Associate Superintendent Education Support Services/Sexual Harassment Complaint Officer/EEOC Compliance coordinator. Ms. Goady–Crosson states that it was her duty to enforce these policies, and to ensure that they were made available to every employee of the District at the commencement of the school year. There does not seem to be a similar complaint procedure addressed to the other forms of discrimination. The undisputed evidence shows that, in response to the December 16 incident, the District investigated the potential sexual harassment as soon as it became aware of the matter, in accordance with its written policy.

But plaintiff's claim of harassment is founded on a series of incidents spanning her brief but eventful tenure at the STAR Academy. And while plaintiff admits that she did not inform Cooper of several of the

alleged incidents of harassment—including all three of the other incidents that she delineated in her complaint as "examples" of Thomas's sexual harassment—the undisputed evidence shows that she did complain to Cooper about Thomas's behavior prior to December 16. There is no evidence in the record before me that Cooper investigated these complaints. To the contrary, on at least one occasion, the evidence shows that Cooper told plaintiff that he did not believe her complaints and simply walked away. Thus, there is at minimum a genuine issue of material fact about whether the District complied with its policy.

Granted, the evidence shows that plaintiff regularly and ardently complained to Cooper about many things unrelated to Thomas, primarily the role of special education at the STAR Academy and her lack of teaching responsibilities. Plaintiff may have overwhelmed Cooper with her barrage of complaints. Nevertheless, based on the evidence before me, there is a genuine issue of material fact as to whether the District knew about the existence of a hostile work environment and did nothing to address it, or failed to provide plaintiff with a reasonable avenue of complaint. Where a reasonable fact finder could conclude that an employer knew of harassment and failed to address it or provided no reasonable avenue of complaint (because he did not respond reasonably and adequately to each of the incidents reported by a plaintiff), it is not appropriate for the court to make a determination as to the liability of the defendant employer. *Richardson,* 180 F.3d at 441–442; *see also, Arias v. Nasdaq/Amex Market Group d/b/a American Stock Exch.,* 2003 WL 354978, at *10 (S.D.N.Y. Feb. 18, 2003) (summary judgment precluded when jury could find, in light of totality of the circumstances, that supervisor knew of possible racial harassment and took no remedial measures).

## IV. Defendant's Motion for Summary Judgment as to Plaintiff's NYHRL Claims Is Also Denied

N.Y. Exec. L. § 296(1) provides in relevant part that: "It shall be an unlawful discriminatory practice: (a) For an employer ..., because of the ... race, ... color, ...[or] sex ... of any individual, to refuse to hire or employ or to bar or to discharge from employment such individual or to discriminate against such individual in compensation or in terms, conditions, or privileges of employment."

New York state courts require the same standard of proof for claims brought under NYHRL as those brought under Title VII, so Title VII and NYHRL claims can be analyzed in tandem. *Quinn v. Green Tree Credit Corp.,* 159 F.3d at 765; *Arias,* 2003 WL 354978, at *7; *see also, Perks v. Town of Huntington,* 251 F.Supp.2d 1143, 1158–1159 (E.D.N.Y.2003) (recognizing disagreement among district courts in the Second Circuit as to whether the standard for vicarious liability is the same under Title VII and the NYHRL but interpreting Second Circuit law, including *Quinn,* to indicate that NYHRL claims should be analyzed under the framework of Title VII).

I thus adopt the above analysis to plaintiff's NYHRL claims; I deny defendant's motion for summary judgment on plaintiff's hostile work environment claims, based on both gender and race.

## V. Defendant's Motion for Summary Judgment as to Plaintiff's Section 1983 and Section 1981 Claims is Granted

Section 1983 provides a cause of action when a party, acting under color of state law, causes the deprivation of another party's federal statutory or constitutional rights. 42 U.S.C. § 1983. To prevail on a Section 1983 employment discrimination

claim, plaintiff must show that defendant's actions caused the denial of a constitutional right or an independent statutory right. *Meckenberg v. New York City Off–Track Betting*, 42 F.Supp.2d 359, 384 n. 15 (S.D.N.Y.1999) (noting that a Title VII violation cannot itself provide the basis for a Section 1983 claim). Plaintiff does not specify which constitutional or statutory rights form the basis of her Section 1983 action, but such claims are frequently pursued under the Equal Protection Clause of the Fourteenth Amendment.

Section 1981 provides that "[a]ll persons... shall have the same right... to make and enforce contracts ... and to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens." 42 U.S.C. § 1981. Because Section 1981 is designed to protect "all persons," the Supreme Court has determined that it is applicable to race-based employment discrimination claims brought by plaintiffs of all races, including Caucasians. *McDonald v. Santa Fe Trail Transp. Co.*, 427 U.S. 273, 286–87, 96 S.Ct. 2574, 49 L.Ed.2d 493 (1976). Section 1981 provides a cause of action for race-based employment discrimination based on a hostile work environment. *Whidbee v. Garzarelli Food Specialties, Inc.*, 223 F.3d 62, 69 (2d Cir. 2000).

Hostile work environment claims under Section 1981 and Section 1983 are analyzed under the Title VII framework. *Whidbee*, 223 F.3d at 62 (hostile work environment claim under Section 1981 assessed under the Title VII framework); *Meckenberg*, 42 F.Supp.2d at 384 (hostile work environment claim under Section 1983 assessed under the Title VII framework). And I have already determined that there is a genuine issue of material fact as to whether plaintiff was subjected to an actionable hostile work environment.

But the defendant school district cannot be held liable in a Section 1983 or Section 1981 action solely on the basis of *respondeat superior*. *Mack v. Port Authority of New York and New Jersey*, 225 F.Supp.2d 376, 382 (S.D.N.Y.2002). To prevail on a hostile work environment claim under Section 1983, plaintiff must: (1) establish a hostile work environment and; (2) show that it was a policy or custom of the District to maintain a hostile work environment or that the District has a policy or custom of deliberate indifference to the existence of a hostile work environment. *Mack v. Port Authority*, 225 F.Supp.2d at 383–384 (applying the standard for municipal liability under Section 1983 set forth in *Monell v. Dep't of Soc. Serv. of New York*, 436 U.S. 658, 690, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978)). Moreover, plaintiff's Section 1981 claim for racial discrimination must be pursued through Section 1983, as Section 1983 provides the exclusive remedy for violation of the rights guaranteed under Section 1981 in a claim against a state actor. *Jett v. Dallas Indep. School Dist.*, 491 U.S. 701, 735, 109 S.Ct. 2702, 105 L.Ed.2d 598 (1989); *accord, Roddini v. City University of New York*, No. 02 Civ. 4640, 2003 WL 435981, at *5 (S.D.N.Y. Feb. 21, 2003) (dismissing Section 1981 claims in an employment discrimination claim against state actor, finding that, under *Jett*, Section 1983 provided plaintiff's exclusive remedy).

Plaintiff has introduced no evidence that would support a finding that it was the district's policy to maintain a hostile work environment or be indifferent to its existence. Plaintiff has not alleged, nor has she introduced evidence to show, that Thomas or Cooper were persons entitled to make policy for the defendant school district. *Mack v. Port Authority*, 225 F.Supp.2d at 384 (granting summary judgment to employer when plaintiff did not

allege or introduce evidence to show that the individuals who allegedly created a hostile work environment for her were entitled to make policy for the employer). Nor has plaintiff introduced any facts from which a rational trier of fact could infer a policy at the school district of deliberate indifference to the creation or maintenance of a hostile work environment. *Id.* The only evidence in the record of any kind regarding the policies of the defendant school district indicate that the school district openly condemned discrimination and sexual harassment. And despite a full and fair opportunity for discovery, plaintiff has not provided evidence to show that the actual custom of the District was not to follow this policy.

Because there is absolutely no evidence in the record from which a rational trier of fact could infer that the District had a policy or custom of maintaining or being deliberately indifferent to a hostile work environment, I grant summary judgment to defendant on plaintiff's claims that the district violated her rights under Section 1981 and Section 1983.

## VI. Defendant's Motion for Summary Judgment as to Plaintiff's Remaining State Law Claim for Willfully Negligent Hiring and Retention of Thomas is Granted.

Plaintiff alleges in her first amended complaint, "upon information and belief," that the District knew that Thomas had been convicted for felony armed robbery and assault when it hired him. She also claims, again "upon information and belief," that "Thomas was alleged to have engaged in additional serious criminal conduct relating to sexual behavior after he began teaching at the District" and that such information was known to the District administrators, but that they negligently retained Thomas. Plaintiff concludes that this "negligence" substantially caused the harm suffered by plaintiff from Thomas's "physically threatening sexual harassment and assaultive conduct at the STAR Academy." Plaintiff again refers to the District having knowledge of Thomas's "sexual deviant misconduct" in her Memorandum in Opposition to Summary Judgment. (Plaintiff's Opposition to Summary Judgment, p. 9.)

But there is absolutely no evidence in the record of Thomas's "serious criminal conduct regarding sexual behavior." Plaintiff does not cite to any record evidence in making this broad and conclusory allegation.

Moreover, as defendant points out in its memorandum in support of summary judgment, plaintiff is clearly barred by New York State Worker's Compensation Law from bringing a common-law negligence claim against the district, because the Worker's Compensation Law provides the exclusive remedy for negligence claims against an employer. N.Y.Work.Comp Law 29(6); *Torres v. Pisano,* 116 F.3d 625, 640 (2d Cir.1997) (upholding district court's grant of summary judgment to defendant employer on plaintiff's claim for negligence in failing to supervise alleged harasser and prevent creation of a hostile work environment; holding that New York State Worker's Compensation Law provided plaintiff's exclusive remedy for a negligence claim against employer). Plaintiff responds to defendant's argument, which was unequivocally supported by controlling law, simply by stating that the defendants are "in error." Plaintiff's two sentence "point" addressing the negligence claim is, like the rest of plaintiff's memorandum, unsupported by any relevant statutory or decisional law.

Defendant's motion for summary judgment dismissing this count is granted.

### VII. Defendant's Motion in Limine Regarding Thomas's Criminal Record is Granted

█ Finally, defendant moves in limine to preclude evidence related to Thomas's prior conviction for armed robbery or the resulting sentence, arguing that his prior arrest has no relationship to the allegations of harassment in this case, and that the allegations are so remote in time as to have no probative value, but are extremely prejudicial to the District. Defendant asks that the Court exclude all evidence concerning Thomas's conviction or subsequent incarceration under Federal Rule of Evidence 402 or Federal Rule of Evidence 403. Plaintiff has not responded to defendant's in limine motion.

Thomas's prior conviction for armed robbery has no probative value in plaintiff's civil case, and is extremely prejudicial. I therefore grant defendant's motion to exclude this evidence under Federal Rule of Evidence 402.

### CONCLUSION

Parties are on forty eight hour notice for trial.

This constitutes the decision and order of the Court.